IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HEALTHCARE INTEGRITY, LLC,
and DAVID CONEJO,

      Plaintiffs,

v.                                                                                      Civ. No. 20-750 KG/LF

REHOBOTH MCKINLEY CHRISTIAN
HEALTH CARE SERVICES, INC. *et al.*,

      Defendants.

MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on (1) Defendants' Motion to Dismiss and Supporting

Memorandum, (Doc. 26); (2) Defendants' Motion to Strike Exhibits Attached to Plaintiffs'

Amended Response to Defendants' Motion to Dismiss and Any References to the Exhibits in

Plaintiffs' Amended Response, (Doc. 39); and (3) Plaintiffs' Motion for Leave to File Second

Amended Complaint, (Doc. 45).  Having reviewed the submissions of the parties and the relevant

law, the Court will GRANT Plaintiffs' Motion for Leave to File Second Amended Complaint,

(Doc. 45).  Because Defendants' Motion to Dismiss and Motion to Strike relate to a pleading that

will be superseded by the filing of the Second Amended Complaint, they will be DENIED AS

MOOT.

BACKGROUND

This case involves claims arising from Plaintiff David Conejo's June 2020 termination as

Chief Executive Officer of Rehoboth McKinley Christian Health Care Services, Inc.

("RMCHCS") and the simultaneous termination of the Management Agreement between Plaintiff

Conejo's company, Plaintiff Health Care Integrity, LLC ("HCI"), and RMCHCS. Plaintiffs allege

that a group of medical providers at RMCHCS—led by Defendant Valory Wangler, RMCHCS' Chief Medical Officer ("CMO Wangler")—intentionally sought and secured Plaintiffs' ouster through a campaign of false and misleading information regarding Plaintiffs' purported mismanagement of staffing and finances during the early days and weeks of the COVID-19 crisis. According to Plaintiffs, CMO Wangler was motivated by a desire to replace Plaintiff Conejo as CEO and secure a lucrative management agreement for her own company. Plaintiffs bring claims under federal and state law against CMO Wangler, other medical providers whom Plaintiffs allege engaged in a conspiracy with CMO Wangler, and the RMCHCS Board of Trustees, which Plaintiffs allege was complicit in CMO Wangler's efforts to oust them. *See* (Doc. 45-1).

Plaintiffs originally filed suit on July 23, 2020, and filed an Amended Complaint as a matter of right on August 9, 2020. *See* (Docs. 1, 4). On November 12, 2020, Defendants moved to dismiss the Amended Complaint in its entirety. *See* (Doc. 26). On May 25, 2021, Plaintiffs sought leave to file a second amended complaint, a request that Defendants oppose. *See* (Docs. 45, 46, 48).

## STANDARD

Under Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleadings only with the opposing party's written consent or the court's leave." Rule 15(a)(2) makes explicit that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The purpose of Rule 15(a)(2) is to provide litigants "the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365-66 (10th Cir. 1993) (citations omitted).

DISCUSSION

Defendants argue that the Court should deny Plaintiffs' request for leave to file their proposed Second Amended Complaint ("proposed SAC") because (1) Defendants will be unduly prejudiced by allowing amendment, (2) Plaintiffs unduly delayed seeking leave to amend, (3) amendment would be futile, and/or (4) Plaintiffs are acting in bad faith or with a dilatory motive. (Doc. 46). The Court considers each argument in turn.

1. Prejudice

The most important factor in deciding a motion to amend the pleadings is "whether the amendment would prejudice the nonmoving party." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1207 (10th Cir. 2006); *see Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) ("Rule 15 was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result." (alteration, quotation marks, and citation omitted)). "Courts typically find prejudice only when the amendment unfairly affects the defendants in terms of preparing their defense to the amendment." *Minter*, 451 F.3d at 1208 (quotation marks and citation omitted); *see Hirt v. Unified Sch. Dist. No. 287*, 308 F. Supp. 3d 1157, 1168 (D. Kan. 2018) ("Under Rule 15, undue prejudice means undue difficulty in prosecuting or defending a lawsuit as a result of a change of tactics or theories on the part of the movant." (quotation marks and citation omitted)). "Most often, this occurs when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues." *Minter*, 451 F.3d at 1208. "While any amendment invariably causes some practical prejudice, undue prejudice means that the amendment would work an injustice to the defendants." *Hirt*, 308 F. Supp. 3d at 1168 (quotation marks and citation omitted).

Plaintiffs seek to make several changes to their complaint, including adding two claims under 42 U.S.C. § 1983 for alleged deprivations of Plaintiffs' Fourteenth Amendment right to procedural due process. Defendants do not argue that the new claims arise out of a subject matter different from what was set forth in the Amended Complaint. Quite clearly, the Section 1983 claims—which are premised on allegations that the RMCHCS Board deprived Plaintiffs of their liberty interest in their good names and their property interest in continued employment without due process of law in terminating the Management Agreement—arise out of the same subject matter set forth, and involve the same actors named, in the Amended Complaint.

Rather, Defendants contend that the prejudice to them is "apparent" based on the facts that the proposed Second Amended Complaint adds two new claims, revises one of the original claims asserted, and adds nearly 100 new factual allegations. (Doc. 46) at 5. Pointing to the Motion to Dismiss they filed in response to the Amended Complaint, Defendants argue that they "have made significant efforts in forming their defense to the claims in the Amended Complaint over the past year" and, further, that Plaintiffs should not be allowed to raise new claims "at this late time after Defendants have fully addressed the legal infirmities of the Amended Complaint." *Id.* at 6. The Court is not persuaded.

This case is still in the early stages of the proceedings; there is no scheduling order in place; discovery has not yet commenced; and Defendants have pointed to nothing that even arguably suggests that they will be unfairly affected in terms of being able to prepare their defense to the claims asserted in the proposed amendment. The fact that Defendants elected to seek early dismissal of this case, formed a defense to a particular claim, and may now have to formulate different or additional arguments does not work an injustice to Defendants. *See Bylin*, 568 F.3d at 1230 (noting that "the expenditure of time, money, and effort alone is not grounds for a finding of

prejudice"). The Court sees no basis for finding that allowing Plaintiffs leave to amend will unduly prejudice Defendants.

    2. Undue Delay

    Defendants next argue that the Court should deny leave to amend because "the allegations in the Second Amended Complaint were known by Plaintiffs at the time of filing the original Complaint" and because Plaintiffs have failed to provide any explanation regarding why they did not include known allegations and claims in their original complaint. (Doc. 46) at 6–9. While true that "[u]ntimeliness alone *may* be a sufficient basis for denial of leave to amend[,]" *Las Vegas Ice & Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir. 1990) (emphasis added), the Court disagrees that the record supports finding that Plaintiffs' "delay" in seeking leave to amend is a sufficient basis for denying their request.

    "In deciding whether a delay is 'undue,' [the court] 'focus[es] primarily on the reasons for the delay.'" *Cohen v. Lonshore*, 621 F.3d 1311, 1313 (10th Cir. 2010) (quoting *Minter*, 451 F.3d at 1206). The Tenth Circuit has held that "denial of leave to amend is appropriate when the party filing the motion has no adequate explanation for the delay." *Id.* (quotation marks and citation omitted).

    Plaintiffs point out that the proposed SAC adds nearly 100 new factual allegations, adds 29 new supporting exhibits, and not only adds two new federal claims but also revises Plaintiffs' Lanham Act claim. *See* (Doc. 45) at 6–7. Plaintiffs state that "[o]wing to the number of new factual allegations and supporting exhibits that Plaintiffs added to the Second Amended Complaint and the specificity of those allegations, it took Plaintiffs' counsel some time to properly vet these allegations and locate and assemble the supporting exhibits." *Id.* at 7. Plaintiffs additionally dispute Defendants' contention that they knew of "'any relationship between RMCHCS and McKinley

County which now forms the basis for their proposed Section 1983 claims'" at the time they filed their original complaint or the Amended Complaint. (Doc. 48) at 10 (quoting Doc. 46 at 6). According to Plaintiffs, they first received documents that would support allegations of state action necessary to support Section 1983 claims in mid-December 2020, after which they took "time to obtain and review all supporting documents and vet all the new allegations in the proposed amend[ment.]" *Id.* at 11–12.

The Court is satisfied with Plaintiffs' explanation. First, a comparison of the Amended Complaint and proposed SAC reveals that Plaintiffs significantly revamped their pleading both organizationally and substantively, which, no doubt, took time. Second, the Court has no reason to disbelieve Plaintiffs' representation that they did not have a factual basis to allege Section 1983 claims until December 2020, which explains why they did not bring those claims in either their original complaint or the Amended Complaint.

Regarding Defendants' contention that the period of time between when Plaintiffs first acknowledged that they were going to bring Section 1983 claims and when they moved for leave to amend "is the definition of undue delay[,]" the Court disagrees. (Doc. 46) at 9. The mere fact that Plaintiffs knew in January 2021 that they planned to bring Section 1983 claims and did not seek leave to add those claims for four months does not, on this record, evince undue delay. Plaintiffs' January 14, 2021, communication to Defendants simply stated, "We are preparing the amended pleading now and will send you a copy to seek concurrence on amending the complaint." (Doc. 45-2) at 5. Nothing in that communication or elsewhere in the record indicates that the amended pleading was, in fact, ready for review by Defendants in January 2021 or at any time before May 2021 when Plaintiffs presented it to Defendants. It would be pure speculation and contrary to what the record shows to find that Plaintiffs finalized the proposed SAC months before

seeking leave to amend and simply sat on it. Indeed, particularly given (1) the complexity of the federal claims that Plaintiffs assert in their proposed SAC, and (2) that Plaintiffs also sought to cure alleged deficiencies in their Lanham Act claim that Defendants argued existed in the Amended Complaint, the Court finds nothing unreasonable about the amount of time it took Plaintiffs to craft an amended complaint and seek leave to amend. The Court thus concludes that undue delay is not a sufficient basis to deny Plaintiffs' request for leave to amend.

3. Futility

"A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007) (quotation marks and citation omitted). Defendants argue that the proposed SAC would not survive a motion to dismiss because even with the additional allegations included therein, Plaintiffs fail to state a claim under either the Lanham Act or 42 U.S.C. § 1983. (Doc. 46) at 10–12. The Court considers whether it appears certain that Plaintiffs would not be entitled to relief under the facts alleged in the proposed SAC on their Lanham Act claim or either of their Section 1983 claims.

a.   Lanham Act Claims

While principally thought of as providing protections against trademark infringement, the Lanham Act also "creates a federal remedy that goes beyond trademark protection." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014). Specifically, it "creates a cause of action for unfair competition through misleading advertising or labeling." *Id.* An unfair competition claim can be premised on either of "two distinct bases of liability: false association, [15 U.S.C.] § 1125(a)(1)(A), and false advertising, [15 U.S.C.] § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). "False association" claims— also known as "product infringement claims"—involve "false representations concerning the

origin or endorsement of goods" or services, while "false advertising" claims involve "false representations in advertising concerning the qualities of goods" or services. *Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867, 873 (10th Cir. 1995), *abrogated on other grounds by Lexmark Int'l*, 572 U.S. 118; *see* 15 U.S.C. § 1125(a)(1) (providing that the cause of action is for misrepresentations with respect to "goods, *services*, or commercial activities" (emphasis added)).

Plaintiffs' Lanham Act claims are premised on alleged false advertising violations under 15 U.S.C. § 1125(a)(1)(B). *See* (Doc. 45-1) at 101. In relevant part, the Act provides:

> (1) Any person who, . . . in connection with any . . . services, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which--
>
> . . . .
>
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her or another person's . . . services . . .
>
> shall be liable in a civil action by any person who believes he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).[1]

---

[1] The Court notes that false-advertising claims under the Lanham Act require a more nuanced and complex analysis than perhaps the statute itself suggests. For example, by its plain language, 15 U.S.C. § 1125(a)(1)(B) allows for the imposition of civil liability only where a false or misleading statement or representation about goods or services was made "in commercial advertising or promotion[.]" *Id.* Whether a statement has been made "in commercial advertising or promotion" is not a straightforward determination. The starting point is the four-part test articulated by the Tenth Circuit, which provides that to qualify as "commercial advertising or promotion," an alleged false statement must be (1) "commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services"; and "(4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Proctor & Gamble v. Haugen*, 222 F.3d 1262, 1273–74 (10th Cir. 2000) (quotation marks and citation omitted). This analysis requires, in turn, additional analysis regarding, *inter alia*, whether the speech at issue is commercial or noncommercial, an analysis implicating constitutional considerations. *See id.* at 1274 (explaining that the meaning of "commercial speech" in the context of a Lanham Act false-advertising claim "tracks the First Amendment 'commercial speech' doctrine"); *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. Of Physics*, 859 F. Supp. 1521, 1533 (S.D.N.Y. 1994) (stating that the Lanham Act "was not intended to apply, and cannot constitutionally be applied, to representations other than those determined to be commercial speech."). The Court does not undertake any such analysis at this time because, as discussed below, Defendants have not addressed their futility arguments to the revised allegations of the proposed SAC.

In the proposed SAC, Plaintiffs allege that CMO Wangler is a person who, in connection with a professional service (i.e., managing a hospital system) made false or misleading statements of fact regarding the hospital management services Plaintiffs provided that, in fact, caused damage to Plaintiffs. (Doc. 45-1) at ¶¶ 454–57, 461, 466, 469. According to Plaintiffs, CMO Wangler "embarked on a campaign to disparage the value and quality of the management services Mr. Conejo and HCI were providing to RMCHCS" because she "knew that Mr. Conejo was well-liked and respected" and that she would "need to create a negative impression of Mr. Conejo . . . if she were to be successful in ousting Mr. Conejo" and HCI so that she could "secure the CEO position for herself under a management contract with her LLC[.]" (Doc. 45-1) at ¶¶ 459–61. Specifically, they allege that CMO Wangler, *inter alia*, "complain[ed] publicly about how Mr. Conejo had cancelled contracts with agency nurses and proposed employee pay cuts and insist[ed] that his mismanagement and desire to turn a profit was endangering patient lives and safety"; made statements to the media suggesting that the entire RMCHCS medical staff had voted "no confidence" in Plaintiff Conejo where, in fact, the majority of physicians and nurses had not signed the No Confidence Declaration; accused Plaintiff Conejo of creating patient safety risks and engaging in retaliatory suspensions; and made the foregoing statements despite knowing that they were false or misleading. *See* (Doc. 45-1) at ¶¶ 163, 189, 194, 217, 225–27, 253–56, 303–310. Plaintiffs also allege that CMO Wangler (1) disseminated the allegedly false or misleading statements to the relevant purchaser of the services: the RMCHCS Board, which had the authority to engage—and/or terminate—the services of a hospital administrator of its choosing; (2) utilized multiple methods of communication, including interviews with news media, email, Zoom videoconferencing, and letters, to disseminate false or misleading statements about the services Plaintiffs were providing; and (3) "made an express sales pitch for the CEO contract" in a letter

she submitted to the Board in May 2020. *See* (Doc. 45-1) at ¶¶ 216, 253–54, 302–3, 454, 470–71. Taking the foregoing allegations as true and construing them in the light most favorable to Plaintiffs as it must, the Court cannot say that it appears certain that Plaintiffs would not be entitled to relief under the Lanham Act.

In arguing that Plaintiffs' Lanham Act claims are futile, Defendants merely refer to and recapitulate the arguments they made in their Motion to Dismiss the Amended Complaint. *See* (Doc. 46) at 10–11. Specifically, they "highlight" their arguments that Plaintiffs have failed to state a Lanham Act claim because (1) any false or misleading statements about Plaintiff Conejo's hospital-management services were not made "in commerce"; (2) CMO Wangler was not a "competitor" to Plaintiffs; (3) no competing good or service was mentioned in any communications; (4) "the Lanham Act is not supposed to quash someone who is expressing points of view or criticizing another"; and/or (5) any false or misleading statements were not disseminated sufficiently to the relevant consumer and, therefore, does not qualify as commercial advertising or promotion. (Doc. 46) at 11. But, as previously noted, the proposed SAC differs significantly from the Amended Complaint, both structurally and substantively and particularly with respect to the allegations supporting Plaintiffs' Lanham Act claims. Indeed, many of the changes Plaintiffs made in the proposed SAC are directly responsive to and intended to cure alleged deficiencies that Defendants argued existed in the Amended Complaint.[2] Even assuming *arguendo* that certain of Defendants' prior arguments were availing vis-à-vis the Amended Complaint, Defendants fail to

---

[2] For example, Defendants argued in their Motion to Dismiss that the Lanham Act claim failed because the Amended Complaint failed to allege that any of the nine defendants it was brought against was a competitor to Plaintiffs. **See Doc. 25 at 7–11.** The proposed SAC attempts to address this alleged deficiency and clarifies that Plaintiffs' Lanham Act claims are brought against only CMO Wangler (under a theory of direct liability) and RMCHCS (under a theory of contributory liability).

address how those arguments continue to apply in the face of the new allegations and clarified theories of liability articulated in the proposed SAC.

Because Defendants have not shown that Plaintiffs' Lanham Act claims as set forth in the proposed SAC are futile, the Court concludes that denial of leave to amend on that basis would be improper.

      b.   Section 1983 Claims

Plaintiffs bring two separate claims under 42 U.S.C. § 1983 in their proposed SAC: (1) deprivation of Plaintiffs' liberty interest in their respective good names in violation of the Fourteenth Amendment's due process clause (Count I); and (2) deprivation of Plaintiffs' property interest in their continued employment in violation of the Fourteenth Amendment's due process clause (Count II). *See* (Doc. 45-1) at 95, 98. Defendants argue that both claims are subject to dismissal—and, therefore, futile—because Plaintiffs' allegations fail to establish that RMCHCS acted under color of law, a necessary requirement to support a claim under Section 1983. (Doc. 46) at 11. Regarding Plaintiffs' liberty-interest claim (Count I), Defendants additionally argue that the proposed SAC fails to state a claim because Plaintiffs have not alleged that they have been permanently excluded from all gainful employment. (Doc. 46) at 11–12. The Court considers these arguments in turn.

      i.   Whether Plaintiffs' Section 1983 Claims Are Futile Because Plaintiffs Have Not Plausibly Alleged that RMCHCS Acted Under Color of Law

Defendants argue that in the proposed SAC, Plaintiffs "acknowledge that Defendants are not state actors. Rather they allege that Defendants were acting under color of state law when terminating Plaintiffs because of a contractual relationship with McKinley County." (Doc. 46) at 11. According to Defendants, Plaintiffs' Section 1983 claims are futile because Plaintiffs "are unable to show a 'close nexus' between RMCHCS and [McKinley] County to establish that

RMCHCS acted under the color of the law[.]" *Id.* Plaintiffs counter that the "nexus" test is not the only test used to determine whether a private party's actions constitute state action for purposes of a Section 1983 claim and that, regardless of which test applies, the inquiry is fact intensive and cannot be decided at this juncture. *See* (Doc. 48) at 7–8. The Court agrees with Plaintiffs.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "Under Section 1983, liability only attaches to conduct occurring under color of law. Thus, the only proper defendants in a Section 1983 claim are those who represent the state in some capacity, whether they act in accordance with their authority or misuse it." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (brackets, quotation marks, and citation omitted). "'In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' requirement under the Fourteenth Amendment.'" *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 928 (1982) (quoting *United States v. Price*, 383 U.S. 787, 794 n.7 (1966). The Tenth Circuit has recognized that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation" and that "the determination as to whether particular conduct constitutes state action frequently admits of no easy answer." *Gallagher*, 49 F.3d at 1447 (quotation marks and citations omitted).

The Supreme Court "has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case." *Id.* Four tests that the Supreme Court has articulated are: (1) the nexus test, which considers "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself"; (2) the symbiotic relationship test, which considers "whether the state

has so far insinuated itself into a position of interdependence with the private party . . . that there is a symbiotic relationship between them"; (3) the willful participant test, which considers whether a "private party is a willful participant in joint activity with the State or its agents"; and (4) the delegation test, which considers whether a private entity is exercising powers "traditionally exclusively reserved to the State[.]" *Id.* (quotation marks and citations omitted). Regardless of which test is applied, the question of whether particular conduct falls within the state action doctrine is a "necessarily fact-bound inquiry[.]" *Lugar*, 457 U.S. at 939; *see Gallagher*, 49 F.3d at 1448 ("As is the case with all of the various tests for state action, the relevant inquiry is fact-specific."). As the Supreme Court has acknowledged, "[t]he true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).

Plaintiffs' proposed SAC does not merely and in conclusory fashion allege that RMCHCS' Board was acting under color of state law. Plaintiffs' proposed SAC, indeed, contains an entire section of allegations dedicated to establishing that "RMCHCS Qualifies as a State Actor for Purposes of Section 1983 Based on RMCHCS' Relationship with the County." (Doc. 45-1) at 5–11. There, Plaintiffs set forth twenty paragraphs summarizing not only applicable New Mexico statutory law regarding public funding of hospitals (Hospital Funding Act, NMSA 1978, §§ 4-48B-1 *et seq.*) but also the history of the relationship between RMCHCS and McKinley County, including the merger in the 1980s of the private Rehoboth Christian Hospital and the county-owned McKinley General Hospital and the various agreements governing operation of the resulting Rehoboth McKinley Christian Hospital. *See id.* Among other things, Plaintiffs allege that the operative lease agreement—the Second Amended Lease Agreement—"recognized the County had oversight of RMCHCS financial operations, a direct voice in its executive and financial affairs,

and could appropriate public funding for operation, maintenance and capital improvements of the Hospital[.]" *Id.* at ¶ 42. Other allegations indicate that McKinley County appointed "several" people to RMCHCS' Board, including McKinley County Deputy Manager Brian Money, who actively participated in Board meetings, including discussions about Plaintiff Conejo's performance, McKinley County's audit of RMCHCS, and staffing issues. *See id.* at ¶¶ 11, 123, 132, 166, 173. Plaintiffs additionally allege that in February 2021—i.e., after Plaintiffs informed Defendants that they would be asserting Section 1983 due process claims—RMCHCS and McKinley County executed a Third Amended Lease Agreement that eliminated McKinley County's voting rights on the Board and reduced RMCHCS' obligations to report to the McKinley County Commission. *See id.* at ¶ 38. Plaintiffs allege, "upon information and belief," that these changes were "intended, inter alia, to reduce the County's role in RMCHCS' governance." *Id.* at ¶ 38.

Taking the proposed SAC's allegations as true and construing them in the light most favorable to Plaintiffs, the Court cannot say that it appears certain that Plaintiffs would not be entitled to relief on either of their § 1983 claims for want of allegations supporting the existence of state action. The question of whether the state-action requirement is satisfied in this case is a fact-intensive inquiry, and the Court finds that Plaintiffs have included sufficient factual allegations in their proposed SAC to withstand Defendants' argument that the Court should deny Plaintiffs' request for leave to amend based on futility.

> ii. Whether Plaintiffs' Liberty-Interest Claim is Futile Because Plaintiffs Did Not Allege Permanent Exclusion from Employment

"A public employee has a liberty interest in his good name and reputation as they relate to his continued employment." *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014). "The government infringes upon that interest when: (1) it makes a statement that impugns the good

name, reputation, honor, or integrity of the employee; (2) the statement is false; (3) the statement is made during the course of termination *and* forecloses other employment opportunities; and (4) the statement is published, in other words disclosed publically." *Id.* (brackets, footnote, quotation marks, and citations omitted).

Defendants argue that "Plaintiffs did not allege any facts to support that Plaintiffs have been permanently excluded from all gainful employment in their profession for this Court to find they have a liberty interest." (Doc. 46) at 12. This, Defendants contend, means that Count I of the proposed SAC would be subject to dismissal for failure to state a claim, thus rendering amendment to add the claim futile. *See id.* Plaintiffs counter that they are not required to allege that they have been permanently excluded from employment to state a liberty-interest claim and that they have "alleged facts that support an inference that statements Defendant RMCHCS made or perpetuated do *effectively exclude* Plaintiffs from their profession[,]" which is sufficient to survive Defendants' futility challenge. (Doc. 48) at 7. The Court agrees with Plaintiffs.

"When a public employer takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities, a claim for relief is created." *Melton v. City of Okla. City*, 928 F.2d 920, 927 (10th Cir. 1991). As the *Melton* Court explained, "[t]he employee does not have to prove *actual* denial of a job opportunity. It is sufficient that a plaintiff prove termination based upon a publicized false charge of sufficient opprobrium that would make the plaintiff an unlikely candidate for employment by a future employer." *Id.* at 927 n.11. It follows, then, that if the plaintiff need not prove actual denial of a job opportunity, he does not fail to state a claim by failing to allege actual denial of a job opportunity or permanent exclusion from all

gainful employment. Allegations supporting the inference that the false statements are sufficiently stigmatizing and disparaging that the plaintiff is unlikely to obtain future employment, i.e., is effectively excluded from employment, are sufficient to satisfy the requirement that the false statements "foreclose[d] other employment opportunities[.]" *McDonald*, 769 F.3d at 1212.

The Court finds that the allegations in the proposed SAC satisfy the foregoing standard. Plaintiffs allege that the RMCHCS Board issued a "pretextual Notice of Default to HCI" that included allegations of multiple breaches it knew were "not well taken[,]" including that Plaintiffs failed to properly staff RMCHCS with medical providers and employees, failed to properly maintain acceptable ratios of staff to patients, failed to negotiate and resolve outstanding contract issues, and failed to cooperate in the audit that McKinley County was conducting. (Doc. 45-1) at ¶¶ 276–87. Plaintiffs additionally allege that the RMCHCS Board falsely stated that Plaintiffs had "failed to cure the breaches" and that "HCI had breached its fiduciary duty by allowing its Manager, Mr. Conejo, to make unauthorized financial arrangements for his own personal financial benefit." (Doc. 45-1) at ¶¶ 411–17. According to Plaintiffs, the alleged false statements "necessarily implied that HCI not only failed to perform a number of duties under a long-standing hospital management contract but also either lacked the competence to complete performance or the interest and professionalism to attempt to cure the breaches." (Doc. 45-1) at ¶ 415. The Court agrees that the alleged false statements are of "sufficient opprobrium" that they allow the inference that Plaintiffs are unlikely to be able to obtain future employment as hospital administrators, i.e., have been effectively excluded from gainful employment in their profession. The Court, thus, concludes that Defendants have not shown that it appears certain that Plaintiffs' liberty-interest claim would be subject to dismissal for failure to allege permanent exclusion from employment.

4. Bad Faith or Dilatory Motive

Defendants briefly, almost in passing, contend that Plaintiffs have sought leave to amend "with bad faith or dilatory motive." (Doc. 46) at 9–10. "Filing a motion to amend in bad faith or with dilatory motive means that the party filed the motion for an inappropriate or suspicious reason or to mislead the court." *Christensen v. Piceance Well Serv., Inc.*, 2016 WL 6956605, at *2 (D. Utah 2018). Bad faith "can be inferred if the proposed amendment directly contradicts allegations made in the original pleading, such that the original and amended factual accounts cannot be reconciled." *Colo. Civil Rights Comm'n v. 1950 Logan Condominiums Condo. Ass'n*, 2013 WL 6858703, at *1 (D. Colo. 2013) (citing *Ayon v. Gourley*, 1999 WL 516088, at *3 (10th Cir. 1999)). "Bad faith may also be inferred if a party seeks leave to amend for an improper purpose." *Id.*

Defendants have not pointed to anything that supports their conclusory assertion that Plaintiffs are acting in bad faith and/or with a dilatory motive in moving to amend. They merely contend that in bringing Section 1983 claims—which they characterize as "suspect federal claims"—Plaintiffs are attempting to "cling to federal court jurisdiction" and argue that "Plaintiffs should not be allowed to add-on two federal claims in order to keep their state law case in federal court." (Doc. 46) at 9–10. As discussed in the previous section, Defendants have failed to persuade the Court that Plaintiffs' Section 1983 claims are futile, much less that that they have been brought for the "improper purpose" of attempting to keep their case in federal court. The Court sees nothing in the record indicating that Plaintiffs are acting in bad faith or with a dilatory motive in seeking leave to amend.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Leave to File Second Amended Complaint, (Doc. 45), is GRANTED. Plaintiffs may file their proposed Second Amended Complaint no later than thirty (3) days from the date of this order.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss, (Doc. 26), and Motion to Strike, (Doc. 39), which relate to a pleading that will be superseded by the filing of the Second Amended Complaint, are DENIED AS MOOT.

_____
UNITED STATES DISTRICT JUDGE